Harold S. Vanderbilt, as Substituted Trustee and as Sole Surviving Executor under the Will of William K. Vanderbilt, Deceased Trustee under a Trust Agreement Made by Said William K. Vanderbilt and Others, Plaintiff, *v.* Consuelo V. Balsan et al., Defendants.

Supreme Court, New York County, February 17, 1948.

*Roy C. Gasser, Leslie D. Dawson* and *Chauncey L. Grant* for plaintiff.

*Otis Bradley* and *Joseph A. Bambury* for John A. E. W. S. Churchill, defendant.

*Thomas I. Sheridan* for John G. V. H. S. Churchill, defendant, and as guardian ad litem for all infant defendants.

ISIDOR WASSERVOGEL, Referee. This action is brought by Harold S. Vanderbilt, as substituted trustee and as sole surviving executor of the will of William K. Vanderbilt, under an indenture of trust, dated November 6, 1895, for judgment settling and allowing the accounts of William K. Vanderbilt, Ivor Churchill Guest and Harold S. Vanderbilt, as trustees, for a construction of said trust indenture, for instructions respecting the several matters referred to in the complaint and for other relief.

The indenture of trust is embodied in a marriage settlement entered into on November 6, 1895, between Charles Richard John, the Ninth Duke of Marlborough, William K. Vanderbilt individually; William K. Vanderbilt and Ivor Churchill Guest, as trustees, and Consuelo Vanderbilt (now Consuelo Vanderbilt Balsan and who for convenience of identification is herein referred to as Consuelo).

The marriage settlement, executed upon the marriage of the Duke and Consuelo, provided for the transfer to the trustees of 50,000 shares of Beech Creek Railroad Company stock valued at $2,500,000, in trust, to pay the income thereof to the Duke for his life and upon his death, to pay the income to Consuelo for her life. Upon the death of the survivor of the Duke and Consuelo, the trustees were to stand possessed of the trust fund and the income thereof for the successor of the Duke, provided that he was an heir male of his body. In the event that the Duke left no heir male of his body him surviving, then to all or such one or

more of the children or issue of the said marriage as the Duke might by deed or will appoint.

Upon the death of the Duke in 1934, the defendant John Albert Edward William Spencer Churchill, son of the late Duke and Consuelo, succeeded to the Dukedom.

### The Issues.

The plaintiff, as substituted trustee, seeks instructions as to his authority and responsibility in respect of payment of English estate and succession duties claimed to have become payable upon the death of the Ninth Duke; as to whether the English or New York law governs in the construction of the trust; and whether the defendant, Tenth Duke of Marlborough, acquired a vested remainder in the trust on his accession to the Dukedom in 1934.

The present Duke, as defendant, maintains that the laws of England apply; that he was vested with an indefeasible remainder upon his father's death, and prays that the trustee be directed to pay or otherwise discharge the English duties claimed to have become payable upon the death of the late Duke.

Since the issues to be determined require a consideration of the nature of the limitation contained in the indenture, the relevant portions thereof are set forth in full:

" IT IS HEREBY AGREED AND DECLARED that the said Trustees their executors administrators and assigns shall stand possessed of the said sum of Two million five hundred thousand dollars of the capital stock of the Beech Creek Railway Company   *   *   *. AND shall during the joint lives of the said Duke of Marlborough and Consuelo Vanderbilt pay the income of the said sum of Two million five hundred thousand dollars   *   *   *   unto the said Duke of Marlborough for his life and from and after the death of the said Duke of Marlborough shall pay the income of the said trust funds unto the said Consuelo Vanderbilt for her life and from and after the death of the survivor of them the said Duke of Marlborough and Consuelo Vanderbilt the said Trustees shall stand possessed of the said trust fund and of the income thereof IN TRUST for the successor of the said Duke of Marlborough in the Dukedom provided that he shall be an heir male of the body of the said Duke of Marlborough party hereto but if the said Duke of Marlborough shall leave no heir male of his body him surviving then IN TRUST for all or such one or more of the children or issue of the said marriage in such proportions and subject to such provisions as the said Duke of Marlborough may by Deed or Will appoint."

### Additional Trust.

The marriage settlement provided for the establishment of an additional trust not here directly involved. Thus, William K. Vanderbilt covenanted to pay to the trustees for the use of his daughter Consuelo, during the joint lives of himself and of Consuelo, the yearly sum of $100,000 and further undertook that, within a year subsequent to his death, his executors would pay the trustees the sum of $2,500,000, the income of which was to go to Consuelo for life; and upon her death, to the Duke for his life. Upon the death of the survivor, the corpus was to be distributed to their children subject, however, to any contrary provision made by the Duke and Consuelo jointly, by deed or appointment and, in default of appointment, as Consuelo should appoint by her will. In the event of no issue, the fund was to go to such person or persons as Consuelo might by deed or will appoint and, in default of appointment, to her next of kin.

It should moreover be observed that some months prior to the marriage settlement, viz., on February 19, 1895, William K. Vanderbilt and Alva E. Vanderbilt, his wife, established a trust which provided that upon the marriage of Consuelo with the consent of her parents, the trustees were to transfer to Consuelo out of the corpus of the trust, 50,000 shares of Beech Creek stock for her sole and separate property. These are the securities which were made the subject of the marriage settlement.

### Background of This Proceeding.

Upon their marriage, the Duke and Consuelo, then the Duchess of Marlborough took up their residence in England. Two sons were born of the marriage, John Albert Edward William Spencer Churchill and Ivor Charles Spencer Churchill.

In 1911, the Duchess of Marlborough separated from her husband, and in 1921 was divorced from the Duke. In the same year she remarried and has ever since been the wife of Colonel Jacques Balsan. In 1941, she reacquired her United States citizenship and is presently a resident of Nassau County, in the State of New York.

On June 30, 1934, the Duke of Marlborough died and the elder son of the marriage succeeded his father in the Dukedom, becoming the Tenth Duke of Marlborough. He is married and has five children now living. His brother, Ivor Charles Spencer Churchill, is living, but has no children.

Since the death of the Ninth Duke, the income of the trust under consideration was and still is being paid to Consuelo, as the second life tenant.

### The English Adjudication.

The instant trust was the subject of a proceeding in the Chancery Division of the English High Court of Justice in 1944. It was there held that upon the death of the Ninth Duke, succession and estate duties became payable under the English Succession Duty Act of 1853 and the English Finance Act of 1894. The parties there were the Attorney-General on behalf of the Commissioner of Inland Revenue and the Tenth Duke of Marlborough. Harold S. Vanderbilt, then sole surviving trustee under the marriage settlement, was not a party and did not participate in the proceeding. That decision, holding that succession and estate duties were payable, was subsequently affirmed by the English Supreme Court of Judicature, Court of Appeal, on December 11, 1944. (*Marlborough [Duke]* v. *Attorney-General,* [1945] Ch. 78.) No appeal was taken therefrom and the time within which to appeal has since expired. The duties so held to be payable, including interest to April 12, 1946, amount to approximately the sum of £175,000.

### The Relief Sought.

In these circumstances, the trustee seeks instructions in the light of the applicable law of England and of this country, as to his duty, power and authority to settle or otherwise liquidate the English duties claimed to be payable.

In that connection, the trustee properly seeks a construction of the nature of the interest taken by the Tenth Duke upon his accession to the Dukedom, since under the indenture, his estate was not to vest in possession until the death of Consuelo. To ascertain whether his remainder is contingent or vested and when the time of vesting arrives, is deemed essential by the trustee so that he may be advised as to which persons take in the appropriate event and to whom he is responsible in the administration of the trust.

### Liability of the Trust to English Estate and Succession Duties.

A discussion of the liability of the trust to English death duties involves the following legal and factual considerations:

(1) In the 1944 English proceeding, succession and estate duties were held to be payable upon the basis of a determination that the marriage settlement was governed by English law.

(2) Section 12 of the English Succession Duty Act of 1853 (16 & 17 Vict., ch. 51) provides that the duty shall not be assessed where the person taking the succession is himself the settlor. That section was not called to the attention of the court in the 1944 proceeding.

(3) Had section 12 of the Succession Duty Act of 1853 been successfully invoked, it would have deferred the payment of succession and estate duties until the death of Consuelo, thus subjecting the estate to taxation at both an increased rate and a higher valuation.

(4) Under the English Finance Act of 1914, estate duty will not be payable on the death of Consuelo, if the duty held to be payable in the 1944 proceeding is paid. That is so because the statute dealing with settled property provides that where estate duty has once been paid upon the death of one of the parties to the marriage, no estate duty is again due upon the death of the other party. However, and it is of moment here, unless the duty is paid, this exemption does not accrue.

(5) It may also be assumed that the estate duty payable upon the death of Consuelo can be avoided by an *inter vivos* transfer of her life estate to the present Duke, provided, however, she survives for a period of five years subsequent to her transfer.

The following alternatives and procedures are indicated to the trustee:

(1) He may take no action whatever, a course that may subject the estate to the payment of two estate duties, namely, the duty held in the 1944 proceeding to have become payable on the death of the Ninth Duke and the duty that will become due upon the death of Consuelo, should she retain her life interest or fail to survive a five-year period subsequent to its transfer.

(2) He may initiate proceedings in England to procure an adjudication that under section 12 of the Succession Duty Act of 1853 no duty became payable upon the death of the Ninth Duke. If successful, this would merely defer the liability for duty to the death of Consuelo.

(3) He may pay the duties held payable in the 1944 proceeding, thereby securing for the estate an exemption from additional estate duty upon the death of Consuelo.

(4) An *inter vivos* transfer by Consuelo of her life estate to the present Duke would eliminate the possibility of duty upon her death, provided she survives five years from the time of the transfer. Contemporaneously, the trustee, if so advised, may initiate the proceedings in England, referred to above, thereby seeking to accomplish complete exemption from duties. This course would be attended by the risk of Consuelo's failure to survive the indicated five-year period, in which event a double tax liability may accrue.

In this setting, the trustee seeks the court's guidance. The alternatives, as they appear to be formulated, invite a consideration of the relevant English statutes and judicial decisions.

### The English Death Duty Statutes.

Under the Succession Duty Act of 1853 (16 & 17 Vict., ch. 51), every disposition of property, by reason whereof any person becomes entitled to any property or the income thereof upon the death of any person dying subsequent to the enactment of the statute, is deemed to confer a "succession" on the person entitled by reason of such disposition or devolution.

The act provides for a graduated succession duty payable upon the value of each such succession, varying in rate upon the relationship of the successor to the predecessor in interest.

In addition, the Finance Act of 1894 (57 & 58 Vict., ch. 30) provides for the levying of estate duties upon the principal value of all property, real or personal, passing upon the death of any person dying subsequent to the adoption of the statute. It expressly provides that property passing upon death shall be deemed to include property in which the deceased had an interest on his death to the extent to which a benefit arises by reason of the termination of such interest. It provides also that property situated out of the United Kingdom is to be included only if succession duty is payable in respect of the said property.

### The 1944 Proceeding.

Based upon the provisions of these acts, the Commissioner of Inland Revenue, in the proceeding referred to, asserted that both succession duties and estate duties became exigible upon the death of the Ninth Duke. Succession duty seemed clearly applicable since upon the death of the Ninth Duke, Consuelo Vanderbilt succeeded to a life estate in the income of the property. Moreover, since succession duty was leviable, it seems to follow, under the provision of the Finance Act of 1894 above referred to, that estate duty also became payable.

In resisting the claim of the commissioner, it was urged that the English succession duties, and therefore the estate duties, must be considered confined in their application to *English* successions. It was argued that the English death duty statutes were not applicable, since the trust fund was created in the United States as part of a marriage settlement; that the agreement was there executed and that the fund was there situated and administered. In holding that the law of England controlled and that succession and estate duty attached, the court said, per Lord Greene, M. R., (*Marlborough* [*Duke*] v. *Attorney-General* [1945] Ch. 78, 89) : "When we turn to the settlement in this case and such circumstances as are admissible, we find the following matters to be considered. Miss Vanderbilt, the settlor of the

railway stock, was at the date of the settlement domiciled in the State of New York but the matrimonial domicile of the parties was clearly to be English. The securities which she settled were American securities, but the terms of the settlement permitted their sale and the re-investment of the proceeds in English securities. Mr. W. K. Vanderbilt himself was domiciled in the State of New York. Of the two trustees, one was Mr. W. K. Vanderbilt, the other was Mr. Ivor Guest, a domiciled Englishman resident in England, so that, presumably, both the courts of the State of New York and the English court would have been competent to enforce the trusts of the settlement. The settlement was executed in New York in triplicate, one part being handed to the English trustee, who brought it to England. * * * The settlement itself was drafted in English form. Taking into account these considerations alone and attaching particular weight to the fact of the matrimonial domicile being English, we should have had little hesitation in deciding that the proper law of the settlement was English, but there are certain provisions in the settlement which appear to us to place this beyond all possible doubt. The first is the reference to 'the statutory power of appointing a new trustee,' a phrase which would be quite meaningless if the law of the State of New York were contemplated. The next provision is the special indemnity given to the trustees 'in addition to the indemnity given by law to trustees.' The law referred to can only be the law of England since the evidence shows that the law of the State of New York, although it recognizes the validity of a contractual indemnity to trustees, does not of itself provide for any indemnity. The last provision is that for the making of an application to the English courts under the Infant Settlements Act with a view to making Miss Vanderbilt's settlement binding on her by English law."

This decision confirmed the decision of the Chancery Division that the duties which, with interest to April, 1946, aggregate approximately £175,000, are now payable.

### Effect of the Decision in Marlborough (Duke) v. Attorney General.

Though the English courts decided that the duties referred to were payable, the sole surviving trustee, being resident here, was not subject to the jurisdiction of England. In the ordinary course, the collection of the duties could not very well be enforced against him. A voluntary submission to the jurisdiction of England by the trustee was, of course, fraught with serious consequences to the trustee, in view of the possible claim by the life

tenant that no duties were now payable and should not have been paid.

Support for the view that the English tribunals erred in their determination was given at the hearings by John Patrick Gorman, a member of the English Bar, and a specialist in the administration of the English statutes relating to estate duties and succession and legacy duties. He testified that since Consuelo was the settlor of the trust, no succession or estate duties were assessable at this time in view of the provisions of section 12 of the Succession Duty Act of 1853. That section expressly provides that any person taking a succession under a disposition made by himself is not chargeable with duty. Section 12 so far as here relevant, follows: "* * * no person shall be chargeable with duty upon the extinction or determination of any charge, estate or interest created by himself, unless at the date of the creation thereof he shall have been entitled to the property subjected thereto expectantly on the death of some person dying after the time appointed for the commencement of this Act."

Mr. Gorman was of the opinion that had this section been called to the attention of the English tribunal, no duties would have been held to be payable. Consuelo being the settlor of the trust, no duty would be chargeable upon her succession since she had succeeded to an estate upon the "determination of any * * * estate or interest created by [herself]".

### Consuelo as Settlor of the Trust.

There is no serious question that Consuelo was, in fact, the settlor of the Beech Creek trust. The fact that she did not transfer the securities to the trustees directly, but ordered the transfer to be made out of another trust, did not alter the fact of her ownership. The securities in question were part of the corpus of a trust under which the fund was distributable to Consuelo in the event of her marriage with the consent of her parents. Formal written consent to the marriage had been given by Consuelo's parents on November 1, 1895. She had met the condition of the trust and thereby became sole owner of the securities. On November 6, 1895, the date of the marriage, Consuelo Vanderbilt acknowledged receipt of the securities, though in fact, they had been directly transferred to the trustees under the marriage settlement, pursuant to her explicit instructions.

In accordance with the provisions of the marriage settlement, moreover, a proceeding had been instituted soon after the marriage in the Chancery Division of the English High Court of Justice to obtain an order approving the marriage settlement

and declaring it a valid and binding settlement of the property of Consuelo. Thereupon, the court entered an order declaring that the marriage settlement was " a valid and binding settlement *of the property of the said Consuelo,* Dutchess of Marlboro ". Consuelo was the settlor of the trust since she owned the stock at the time the trust was created (*Guaranty Trust Co.* v. *N. Y. Trust Co.,* 297 N. Y. 45).

In *Guaranty Trust Co.* v. *N. Y. Trust Co. (supra)* the court said per FULD, J., at page 50: "There can be no doubt that the person who furnishes the consideration for the creation of a trust is the settlor, even though, in form, the trust is created by another. (*Morgan* v. *Fiduciary Trust Co.,* 290 N. Y. 615; *Maynard* v. *Farmers' Loan & Trust Co.,* 208 App. Div. 112, affd. 238 N. Y. 592; 1 Bogert on Trusts and Trustees, § 41; 1 Scott on Trusts, § 17; 3 Scott on Trusts, §§ 422A-425; Griswold on Spendthrift Trusts [2d ed.], §§ 487-491; cf. *Matter of Blake,* 226 App. Div. 580, affd. 252 N. Y. 613.)"

The law of England is in accord and suggests the test whether, taking the transaction as a whole, and having regard for substance rather than form, Consuelo Vanderbilt was the person who had the disposition of the property at the time the marriage settlement was made.

In *Braybrooke* v. *Attorney General* (9 H. L. C. 150; 11 Eng. Rep. 685) principally relied upon by Mr. Gorman in support of his opinion, it appeared that the father, a tenant for life, and his son the tenant in tail in remainder joined to break the entail and resettle the property. The question then arose as to the effect of section 12 under the resettlement, whereby the father took an estate for life and the son an estate in remainder. While it was held that the son was the settlor, duty was nevertheless payable since he, at the time of the settlement, had an estate expectant on the death of the predecessor. The court emphasized that section 12 must be construed according to the plain and obvious meaning of the words: In the popular sense the pivotal question was "whose property was it that was settled?" In holding that the son was the settlor, the court realistically determined that the substance of the transaction was decisive. Mr. Gorman leans heavily on that authority for his conclusion that Consuelo Vanderbilt must be deemed the settlor of the Beech Creek stock.

Section 12 being applicable, and the interest settled not being expectant on the life of any other person, the conclusion is inevitable that succession duty and, therefore, estate duty, were not payable upon the succession of Consuelo following the death of the Ninth Duke in 1934.

*Effect of Applicability of Section 12 of the Act of 1853.*

It might appear extraordinary that so vital and conclusive a point was overlooked by the representatives of the Duke in the 1944 proceeding. Closer examination of the English death duty statutes, which, as Mr. Gorman testified, are " very obscure and complicated ", discloses that, had this point been successfully taken, the trust in the last analysis would have suffered substantial financial loss. Though freed thereby of duty on the death of the Ninth Duke, the trust would then become subject to much heavier duties payable upon the death of Consuelo. This follows from subdivision (2) of section 5 of the Finance Act of 1894, as modified by the Finance Act of 1914 (4 & 5 Geo. 5, ch. 10), which provides that where estate duty has once been paid in respect of settled property subsequent to the date of the settlement, estate duty shall not again be payable in respect thereof on the death of the other party to the marriage, until the death of a person who was competent to dispose of the property.

Where, however, the estate duty has not been paid, the exemption does not accrue. Thus, exemption from duty upon the death of the Ninth Duke, under section 12, would have availed the ultimate beneficiaries nothing. No estate duty being then payable, it would follow that an estate duty would be exigible upon the death of Consuelo, measured by the higher rates then in effect and based upon the increased value of the estate at that time.

For these reasons, it would have been futile to claim any exemption in the English proceeding, merely upon the footing that Consuelo Vanderbilt succeeded to an estate upon the termination of an interest which she herself had created as settlor, as provided in section 12 of the act.

Succinctly stated, unless the duty already held to be payable is paid, the trustee is squarely confronted with the possibility of having to pay two estate duties, namely, the first, upon the death of the Ninth Duke, and the second, upon the death of Consuelo. It is estimated that in this eventuality, estate duties payable would aggregate approximately £326,750, thereby substantially reducing the estate.

*Effect of Inter Vivos Transfer.*

A present transfer by Consuelo of her life estate to the Tenth Duke, with the purpose of avoiding thereby the payment of additional estate duty upon her death, was suggested upon the hearings. While section 15 of the Personal Property Law prohibits a beneficiary from transferring the right to receive the income

of personal property, this inhibition is inapplicable where the beneficiary is the settlor of the trust (*Newton* v. *Hunt*, 134 App. Div. 325, affd. 201 N. Y. 599). Under English law, similarly, the life tenant may freely dispose of her estate.

Subdivision (1) of section 43, part IV of the English Finance Act of 1940 (3 & 4 Geo. 6, ch. 29) provides that where an interest limited to cease on a death, has been disposed of after becoming an interest in possession, the property in which the interest subsisted is not to be included as passing upon the death of the deceased, where the disposition is effected in good faith at least five years prior to the death. Thus, if Consuelo should execute a present transfer of her life interest to the Tenth Duke, and survive for a five-year period subsequent thereto, no estate duty will accrue upon her death. The trustee would then also be in a position to consider the advisability of challenging the liability held to be due in the 1944 proceeding. This course would not then be fraught with the risk of involving the trust in liability for two distinct estate duties and would permit a proceeding to vacate the determination already made, in the hope of avoiding estate duties *in toto*. Succession duty (as distinguished from estate duty) would be payable, however, in any event, upon the accession of the Tenth Duke to his interest in the corpus of the trust, upon the death of Consuelo.

In this situation, the Tenth Duke desires the trustee to pay the duties already assessed at the earliest opportunity. His mother Consuelo has joined in this application. The trustee accordingly seeks instructions as to his authority and duty, under the circumstances, to subject himself to the jurisdiction of the English courts and to settle or otherwise liquidate the duties adjudged to be due.

*Nature of Interest Held by Present Duke of Marlborough.*

It is material in this connection to determine the nature of the interest in the trust fund presently held by the Tenth Duke. Obviously, if the Duke now holds a vested remainder, not subject to defeasance, the trustee, upon obtaining the consent of the Duke and the life tenant, will be protected against any possibility of claim based upon the liquidation of the English duties. If, on the other hand, the interest of the Duke is contingent or is to be regarded as vested, subject to defeasance upon his failing to survive the present life tenant, the trustee would be required to consider the interests of persons entitled to take in that event.

The indenture provides that "from and after" the death of the survivor of the Ninth Duke and Consuelo, the trustees shall

stand possessed of the fund and the income thereof, in trust, for the successor of the said Duke of Marlborough in the Dukedom, provided that he shall be an heir male of the body of the said Duke; but if the said Duke leaves no heir male of his body him surviving, then, in trust, for all or such one or more of the children of the marriage as the said Duke might by deed or will appoint. It is asserted on the one hand that the present Duke of Marlborough acquired an indefeasibly vested remainder upon his succession to the Dukedom, which would not be defeated though he died before Consuelo, when the trust would terminate. That is the view taken by the Tenth Duke as defendant.

Another possible construction is that upon the termination of the trust, the *then* successor to the former Duke of Marlborough, whether he be the present Duke, or his son, would become entitled to the estate. The latter view would construe the instrument to intend that the holder of the estate is to be ascertained as of the date of distribution, the person *then* answering the description set forth in the indenture to take. Upon this construction, if the present Duke predeceased Consuelo, presumably his eldest son, as the successor to the Dukedom and as heir male of the body of the Ninth Duke, would become entitled to the fund. Also, in the remote possibility that the successor to the Dukedom is, at the time of distribution, a person other than an heir male of the body of the Ninth Duke, the limitation over contained in the indenture would become effective, requiring distribution to all the children of the marriage then surviving.

### The Authorities.

It is familiar doctrine in construing limitations of real or personal property, created either by testamentary devise or *inter vivos* grant, that the intent of the settlor or testator is the dominating consideration. Canons of construction are guides merely for the purpose of ascertaining the true intent of the author of the instrument being construed. The intention of the settlor "is to be sought in all his words, and, when ascertained, is to prevail" (CARDOZO, J., *Matter of Beuchner*, 226 N. Y. 440, 444). But "the search for intention is often a search after a phantom" (*Matter of Chalmers*, 264 N. Y. 239, 245-246). It may be, that the settlor or testator "simply failed to think the subject through" (*New York Life Ins. & Trust Co.* v. *Winthrop*, 237 N. Y. 93, 109). Where the limitation is reasonably susceptible of differing interpretations, rules of construction must be applied and the legal implications of the formula adopted in the

instrument given effect (*Matter of Chalmers, supra,* p. 247; *Matter of Tamargo,* 220 N. Y. 225).

Here the indenture supplies no decisive answer to the questions which have been raised. The author of the indenture clearly contemplated the contingency that the successor to the Dukedom might be a person other than a male heir of the body of the Duke. In that event, provision was made for distribution either to all of the children of the marriage or to such one or more of said children as the Duke might by deed or will appoint. But the instrument does not expressly signify whether the successor to the Dukedom at the time of the Ninth Duke's death or at the termination of the trust was intended.

### Intent of the Settlor.

In seeking the intent of the settlor, consideration must be given to the surrounding circumstances at the time of the grant (*Furniss* v. *Cruikshank,* 230 N. Y. 495). The language of the instrument must be read against the background of the conditions surrounding the settlor, in the light of the purposes of the grant, the relationship between the settlor and the objects of his bounty and the nature of the property settled (*Matter of Pennock,* 285 N. Y. 475). A marriage settlement is manifestly intended to make provision for the parties to the marriage and their children. Here, there is indicated the further purpose of confining the estate to an heir male of the body of the Duke who succeeds to the Dukedom. There is, however, no clear indication of a purpose to prefer the grandson of the Duke to his son in the event of the latter's failure to survive the duration of the trust. On the contrary, there is language in the deed tending to indicate a contrary objective.

The limitation over is couched in these words: "* * * but if the said Duke of Marlborough shall leave no heir male of his body *him* surviving * * *." (Italics supplied.)

The survivorship here referred to is as of the death of the Duke, rather than that of Consuelo.

On the other hand, there is the clear language of the indenture which directs that "from and after the death of the survivor of them the said Duke of Marlborough and Consuelo Vanderbilt", the trustees shall stand possessed of the trust fund for the successor of the said Duke of Marlborough provided that he be an heir male of the body of the Duke. Accordingly, the remainder is expressly stated to take effect as of the death of the survivor of the Duke and Consuelo. This may suggest a basis for the view that the successor to the Dukedom entitled to the remainder

is to be ascertained as of the death of the survivor of the parties to the marriage.

### The Canons of Construction Applicable.

Where the intent of the settlor is doubtful, the courts have relied upon canons of construction which are intended "to shed light where otherwise would be but darkness" (ANDREWS, J., *Matter of Rooker*, 248 N. Y. 361, 364). It has accordingly been suggested on behalf of the Tenth Duke that the remainder vested indefeasibly in him upon his accession to the Dukedom because the law favors the early vesting of estates. Substantial authority is available for that view (*Hersee* v. *Simpson*, 154 N. Y. 496; *Matter of Chalmers*, 264 N. Y. 239, 244 *supra*).

There is no doubt that from earliest times, the law has favored the vesting of estates at the earliest possible time (2 Jarman on Wills [7th ed.], p. 1330). At common law, the strong judicial predisposition toward the early vesting of estates arose from the destructibility of contingent remainders which did not vest at or prior to the termination of the preceding estate (*Archer's Case*, 1 Co. Rep. 66a, 76 Eng. Rep. 146 [1597]; *Colthirst* v. *Bejushin*, 1 Plow. 21, 24-25; 75 Eng. Rep. 33 [1550]). This doctrine, based upon the common-law concepts of seisin, has little present validity. Contingent remainders have long since been declared indestructible by statute, irrespective of the premature termination of the preceding estate (Real Property Law, § 58).

The doctrine of early vesting of estates, however, has survived (*Matter of Chalmers*, 264 N. Y. 239, 244, *supra*; *Hersee* v. *Simpson*, 154 N. Y. 496, *supra*), and the courts strive uniformly to reach that construction of a future estate which will result in its vesting at the earliest time consistent with the purpose and intent of the creator of the limitation. Whether this rule of construction however should suffice of itself to turn the scale in favor of a determination that the remainder vested indefeasibly on the death of the Ninth Duke is a matter not free from doubt.

### Statutory and Common-Law Classifications of Vested and Contingent Remainders.

Statutory or common-law definitions of vested and contingent remainders throw little light on the point. The applicable New York statute provides that a remainder vests "when there is a person in being, who would have an immediate right to the possesssion of the property, on the determination of all the intermediate or precedent estates." (Real Property Law, § 40.) There is no doubt that the present Duke holds a vested remain-

der under this statutory definition, since he is a "person in being" having an immediate right to the possession on the determination of the precedent estates. The difficulty is that the statutory definition of contingent remainders is equally applicable. Thus, the statute provides that a remainder is contingent "while the person to whom or the event on which it is limited to take effect remains uncertain." (Real Property Law, § 40.) If survivorship at the date of the termination of the trust is required, it follows that the person to whom the estate is limited presently " remains uncertain.". Accordingly, a remainder might be both vested and contingent at the same time (*Coster* v. *Lorillard,* 14 Wend. 265, 302). Thus, a limitation to A for life, remainder to the surviving children of A vests in the children of A during the life of A, since the children have an immediate right to possession on the determination of the precedent life estate; but their estate is nevertheless contingent on survivorship. Accordingly, under the statute an estate may be vested, "though defeasible by death before the moment of division" (*New York Life Ins. & Trust Co.* v. *Winthrop,* 237 N. Y. 93, 103, *supra,* CARDOZO, J.; *Hennessy* v. *Patterson,* 85 N. Y. 91; *Purdy* v. *Hayt,* 92 N. Y. 446; *Paget* v. *Melcher,* 156 N. Y. 399).

The common-law distinctions between vested and contingent remainders are similarly inapposite. As has been indicated, grave consequences attend at common law upon the decision as to whether a specific limitation was vested or contingent. Concepts of seisin and the underlying presuppositions of feudal tenures were primarily responsible for the gravity of the distinction. At a time when ownership of real property was regarded as synonymous with physical possession so that ownership could not be transferred except by ceremonies involving the physical cutting of sod and the breaking of a twig (2 Pollock & Maitland, History of English Law, p. 85), it was not possible to conceive of a situation in which no one was entitled to the possession. Accordingly, a future interest limited to take effect upon an event which had not occurred at the time of the termination of the prior estate would necessarily be destroyed. This doctrine of the destructiblity of contingent remainders also carried with it the concept that such remainders were neither alienable, devisable nor descendible. Contingent interests moreover tended to derogate from the right of the King to the incidents of feudal tenures, since the tenure being contingent upon the performance of the feudal services, it was essential that there be some person in being entitled to the possession and therefore charged with its feudal obligations. In modern times,

the nondestructibility of contingent remainders, and their free alienability (Real Property Law, §§ 58-59) have largely obliterated the importance of common-law distinctions between vested and contingent remainders. Indeed, it has been suggested that "There has been and continues to be a great amount of wasted effort on the part of lawyers and judges on this question." (Walsh, Future Estates in New York, p. 69.)

But, as has been pointed out, we are concerned with the realities of the situation rather than with ideals (Fowler, Real Property Law of New York, p. 233). The difference between contingent and vested remainders is deeply imbedded in the law and cannot be lightly disposed of without regard to precedent or statute. " We do not readily uproot the growth of centuries " (*Techt* v. *Hughes*, 229 N. Y. 222, 240). Contingent remainders particularly " are intelligible only in the light of history " (Cardozo, Nature of the Judicial Process, p. 55).

The early significance of the difference between contingent and vested remainders and the overriding inclination of judges to find a vested rather than a contingent remainder, resulted in the rendering of numerous apparently irreconcilable decisions and introduced into the law many intricacies and elaborate refinements. When the New York statutory revisers undertook in 1828 to bring about " greater simplicity " in these distinctions, their efforts were attended by scant success. In fact, the view was held that the statutory provision merely was declaratory of the common law (4 Kent's Comm. [14 ed.], p. 202), though the courts considered that a new doctrine had been adopted (*Moore* v. *Littel*, 41 N. Y. 66).

Numerous attempts made by distinguished text writers and jurists to prescribe criteria for distinguishing between vested and contingent remainders have not resolved the dilemma (*Smith* v. *Packhurst*, 3 Atk. 135; 26 Eng. Rep. 881; Cru. Dig., tit.16, ch. 1, § 43; 1 Preston, Treatise on Estates, p. 77; 2 Blackstone's Comm., p. 168). In each case, the analysis adopted was largely dependent upon the common-law doctrine of the destructibility of contingent remainders. The celebrated classification by Fearne (Contingent Remainders, p. 5), was likewise largely founded upon this latter doctrine, though he classified as contingent a remainder limited to the survivor of two or more persons in being, where such survivorship could not be determined until the expiration of precedent estates (Fearne, Contingent Remainders, p. 5; see, also, *United States Trust Co.* v. *Roche,* 116 N. Y. 120, 131; *Moore* v. *Littel, supra,* p. 80; *Purdy* v. *Hayt, supra,* p. 454; *Townshend* v. *Frommer,* 125 N. Y. 446, 468, 470; *Matter of Allen,* 151 N. Y. 243).

But these definitions and classifications are not helpful since they assume the existence of the contingency, viz., survivorship to the date of distribution, which is the issue here to be determined. It is necessary therefore briefly to review the course of judicial decisions in this State upon comparable limitations.

In the leading case of *Hennessy* v. *Patterson* (85 N. Y. 91, *supra*) property was devised to the wife of the testator for the use of herself and her daughter, remainder to the children of the daughter if she married and was survived by such children, but in default of issue, then to a nephew of the testator. Though the nephew predeceased the daughter, it was held that his interest was vested, subject to being divested only in the event that the daughter was survived by issue. That event not having occurred, the heirs of the nephew were entitled to the fee.

In its opinion, the court analyzed common-law distinctions between vested and contingent remainders and dwelt at length upon the effect thereon of the provisions of the revised statutes. It is significant that the court concluded, regardless of the common-law and statutory classifications, that the one vital question was whether the nephew's estate was conditioned upon the contingency that he survive the daughter (FINCH, J., p. 100). Thus, the court said, at page 101: " Tested by these definitions the estate of Foley is to be deemed a contingent remainder, vesting as a right upon the death of the testator, and in interest and possession upon the death of Margaret without issue living, unless, indeed, the survivorship of Foley is made by the terms of the will an additional and further contingency. We are thus brought again to what we have already described as the pivotal question in the case, and it is necessary now to consider it."

Characterization of the interest of the present Duke as vested or contingent therefore is not particularly helpful. The " pivotal " question is whether survivorship as of the termination of the trust is a " further " contingency.

In the *Hennessy* case (*supra*), the court, though it characterized the nephew's interest as contingent, nevertheless concluded that survivorship was not a condition of the gift and that the estate had vested in the nephew and, accordingly, descended to his heirs.

The court said, at pages 104–105: " We conclude, therefore, in this case, that John Foley took a contingent remainder, which vested in him at the death of the testator as a right according to its character, and which descended to his heirs, so that, upon the death of Margaret, leaving no issue, the estate vested in the defendants."

This reasoning would require a holding here that the estate of the present Duke vested indefeasibly upon his accession to the Dukedom, survivorship at the date of the termination of the trust not being a condition of the gift.

The *Hennessy* case (*supra*) should be contrasted with *Purdy* v. *Hayt* (92 N. Y. 446, *supra*) where the testator bequeathed his property to his sisters A and B during their lives, then to C during her life, the principal then to be divided equally between the children of C. The remainder in the children of C was held contingent upon survivorship as of the death of C, the limitation being therefore void as in violation of the statute against perpetuities. The court said, per ANDREWS, J., at pages 454–455: "This brings the remainder precisely within the statute definition of a contingent estate, which declares that future estates are contingent whilst the person to whom, or the event upon which they are limited to take effect, remains uncertain, and within the fourth class of contingent remainders mentioned by Mr. Fearne. (1 R. S. 723, § 13; Fearne on Contingent Remainders, 9.) In this case the remainder, when created, depended upon a double contingency, viz.: the birth of children to the testator's niece and their survivorship of the mother. One of these contingencies has happened, the other is still uncertain. That the remainder in this case is contingent, is, we think, settled by decisions in this State upon similar language, in cases arising since the Revised Statutes. (*In re Ryder*, 11 Paige, 185; *Savage* v. *Burnham*, 17 N. Y. 571; *Carmichael* v. *Carmichael*, 4 Keyes, 346.)"

Despite the court's reliance upon statutory and common-law definitions of contingent remainders in support of its conclusion, it is evident that the decision actually turned upon its determination that survivorship as of the termination of the precedent estates was a condition of the gift.

A like result was reached in *Matter of Baer* (147 N. Y. 348), where the devise was to the use of the daughter of the testatrix for life, then to her issue, if any; in default of issue, to another for life, with remainder to the children and heirs of the brother of the testatrix, share and share alike. The daughter died without issue and thereafter the second life tenant also died and the trust terminated. The brother was survived by ten children, all of whom however predeceased the daughter. Holding that the remainder to the children of the brother was contingent until the death of the daughter, when it vested in the children of the brother then living, the court said, per O'BRIEN, J., at pages 353–354:

" The language of the will, read in the light of settled rules of construction, indicates quite clearly that she did not intend that the remainder should vest upon her death in the then living children and heirs of her brother, but should be postponed until the time for division and distribution arrived, and then to vest in such persons as answered to the description who survived. The children of her brother were to take no interest whatever, except upon the contingency of her daughter's death without issue. In case of her death leaving issue such issue would take the remainder absolutely.

" Where final division and distribution is to be made among a class the benefits of the will must be confined to those persons who come within the appropriate category at the date when the distribution or division is directed to be made. (*Bisson* v. *W. S. R. R. Co.*, 143 N. Y. 125; *Goebel* v. *Wolf*, 113 N. Y. 405–411; *Teed* v. *Morton*, 60 N. Y. 506; *In re Smith*, 131 N. Y. 239, 247.) In such cases the gift is contingent upon survivorship, and if it vests at all before the date of distribution it is subject to be divested by the death before that time of a person presumptively entitled to share in the distribution. While this rule is sometimes made to yield to indications of a contrary intent in the will, yet it may be said to be a general rule and there is nothing to be found in the will in question to prevent its full application."

Ascertainment of the date of survivorship was similarly the decisive consideration in *New York Life Ins. & Trust Co.* v. *Winthrop* (237 N. Y. 93, *supra*) where the testator devised his estate to his wife for life and upon her death to a designated daughter for life; upon the death of the said wife and daughter, the remainder to the issue of the daughter, share and share alike, or in default of issue, to the next of kin of the daughter. The daughter died first without issue and the wife died some years later. The gift to the next of kin was held contingent and defeasible until the death of both the wife and the daughter, it being the testator's manifest purpose that vesting be postponed until the trust was at an end. The court said, per CARDOZO, J., at pages 103–104: " Survivorship being a condition, we hold that it is survivorship at the time of distribution (*Vincent* v. *Newhouse, supra; Teed* v. *Morton*, 60 N. Y. 502 *supra*; *Miller* v. *McBlain*, 98 N. Y. 517; *Bowman* v. *Bowman, supra; Young* v. *Robertson, supra*; 2 Jarman on Wills, pp. 733, 734, 736; 28 Halsbury's Laws of England, p. 725, § 1351). We are not blind to the fact that other readings of the will are possible and plausible. In such a situation, the canon of construction which distinguishes between

a direct gift and one through the medium of a mandate to deliver and convey may fairly turn the scale (*Matter of Bostwick, supra; Matter of Baer,* 147 N. Y. 348; *Salter* v. *Drowne, supra,* at p. 215; *Fulton Trust Co.* v. *Phillips,* 218 N. Y. 573, 583; *Wright* v. *Wright,* 225 N. Y. 329).''

A different result was reached in *Matter of Chalmers* (264 N. Y. 239, *supra*) where the trust was to the testator's widow for life, then to the daughter for life, with remainder upon the death of the daughter to her children and descendants, and next of kin. The daughter predeceased the widow who thereafter died. It was held that the remainder vested indefeasibly in the remainderman upon the death of the daughter, though the mother was then the sole.'' next of kin '' and the trust had not then terminated. The court said, per LEHMAN, J., at pages 245–246:

'' Words in a will must be given the meaning which it appears the testator intended.

'' True, the search for intention is often a search after a phantom. Probably that is the case here. The testator has clearly evinced his intention that after the death of his wife each child should enjoy for life the income from certain trust funds and that the remainder should be distributed at the death of the second life tenant to her descendants, heirs at law or next of kin.''

### The '' Divide and Pay Over '' Rule.

In the foregoing decisions of the Court of Appeals, consideration was given to the so-called '' divide and pay over rule '' in the construction of the various limitations. The classic statement of this rule is found in *Matter of Crane* (164 N. Y. 71), where the court said, per PARKER, Ch. J., at page 76: '' Where the only words of gift are found in the direction to divide or pay at a future time the gift is future, not immediate; contingent and not vested. (*Matter of Baer,* 147 N. Y. 348, 354; *Delafield* v. *Shipman,* 103 N. Y. 464; *Delaney* v. *McCormack,* 88 N. Y. 174, 183.)''

It will have been noted that the gift to the Tenth Duke in the instant indenture is found exclusively in the direction to the trustees to pay over to the successor to the Dukedom at a future date, viz., '' from and after the death of the survivor of them the said Duke of Marlborough and Consuelo Vanderbilt ''.

The problem raised by the application of this doctrine was succinctly stated in *Smith* v. *Edwards* (88 N. Y. 92), where the court said, per FINCH, J., at pages 103–104: '' It has been often held, that if futurity is annexed to the substance of the gift, the

vesting is suspended; but where the gift is absolute and the time of payment only is postponed, the gift is not suspended but vests at once. Critically examined, this is little more than stating the same problem in another form of words, and amounts practically to saying that if the gift is future, it is not present; but nevertheless it has been useful in drawing sharply the distinction between a gift presently given, and its deferred payment. (1 Jarman on Wills, 759; *Warner* v. *Durant*, 76 N. Y. 136.) Out of that distinction has grown a rule which bears directly upon the present case, that where the only gift is in the direction to pay or distribute at a future time, the case is not to be ranked with those in which the payment or distribution only is deferred, but is one in which time is of the essence of the gift. (1 Jarman on Wills, 762.) The cases cited as holding this doctrine were instances in which the gift was conditioned upon an event to be determined in the future. (*Leake* v. *Robinson*, 2 Mer. 363; *Ford* v. *Rawlins*, 1 Sim. & Stu. 328; *Taylor* v. *Bacon*, 8 Sim. 100.) In such cases, until the happening of the future event, it must necessarily remain uncertain whether a gift would exist at all, and that could not be said to have vested which was not certainly given.''

The principle involved is, as has been indicated, a canon of construction, not a rule of property (*United States Trust Co.* v. *Taylor*, 193 App. Div. 153, affd. 232 N. Y. 609). It has been said that the rule yields readily to indications of a contrary intention and is subordinate to the doctrine that an interest is to be considered as vested rather than contingent, if this construction is at all possible (*Matter of Chalmers, supra; Ohio National Bank* v. *Boone*, 139 Ohio St. 361). The rule has been vigorously criticized (Walsh, Future Estates in New York, p. 52; Gluck, The `` Divide and Pay Over '' Rule in New York, 24 Col. L. Rev. 8). And it has been said that in view of the many exceptions to the rule, there is doubt whether the doctrine actually functions in the determination of cases (2 Simes, Law of Future Interests, § 394, p. 178). Indeed, the American Law Institute, in the Restatement of Property, has flatly repudiated the doctrine. In commenting upon this rule, it is there stated (3 Restatement, Property, § 260, p. 1313–1314): `` Wherever this ' divide and pay over ' rule has been asserted to exert constructional force in favor of the existence of a condition precedent of survival, two exceptions to the rule have been also recognized and one or both of these exceptions always applies to any situation which is within the rule itself. The first of these exceptions states that the rule has no significance if the

postponement of the division and payment is for the purpose of letting in an intermediate interest. The second exception states that the rule has no significance when the postponement of the division and payment is for the convenience of handling the assets which are the subject matter of the limitation, as for example, when the intended recipient is an infant and the postponement is to provide management during his infancy, or when the assets require liquidation and the postponement is to facilitate a profitable liquidation of them. These two exceptions so completely cancel the rule as to leave nothing in either the rule or its exceptions helpful to the construer of a limitation.''

Whatever may be said of the merits of the doctrine in general, it is clear in any event that one of the settled exceptions to the rule is applicable here, viz., where postponement of distribution is for the purpose of letting in an intermediate estate, the interest is deemed vested as of the death of the first life tenant (see Walsh, Future Estates in New York, p. 54). Here, there can be little doubt that the postponement of the distribution to the successor to the Dukedom was for the purpose of letting in Consuelo's intermediate estate.

### Construction of '' First Sons '' Limitations.

Neither the research of counsel nor independent examination of the authorities has disclosed any prior judicial construction of a limitation identical with that here involved. Prior to the abolition in this State of estates tail, however, devises had been frequently made to the '' first son '' of the testator, a limitation which closely parallels the instant one, since the successor to the Dukedom is, under English regulation, the eldest son. Such limitations to the '' first son '' of the testator have uniformly been construed to result in the indefeasible vesting of the estate, though the first son predeceases the termination of a precedent life estate.

Thus, in *Vanderheyden* v. *Crandall* (2 Denio 9, affd. *sub nom. Wendell* v. *Crandall*, 1 N. Y. 491), the testator devised property to his grandson Mathias, the remainder '' from and after '' the decease of the life tenant, '' to the first son of the body of the said Mathias * * * and to the heirs male of the body of such first son, lawfully issuing '' and in default thereof, to his second, third and every other son of said Mathias, successively and to the heirs male of their bodies respectively. Mathias, the life beneficiary, had four sons, the eldest of whom (Dirk) died without issue in the lifetime of his father Mathias. It was

held that the remainder was contingent until the birth of Dirk, the life beneficiary's first son, at which time it became indefeasibly vested so that on his death without issue, the remainder passed to his heirs at law, the estate, accordingly, passing to Mathias, his father. The court held that the remainder " being limited by this devise to dubious and uncertain persons " (p. 18) was contingent until the birth of Dirk, who answered the description in the will as the first son of the body of the said Mathias; and that on his birth, the remainder became indefeasibly vested. It is noteworthy that in determining that survivorship as of the death of the life tenant (Mathias) was not required, the court relied on the fact that the remainder was vested under the common-law classification, stating per BEARDSLEY, J., at pages 18–19: " ' * * * the present capacity of taking effect in possession, if the possession were to become vacant, and not the certainty that the possession will become vacant before the estate limited in remainder determines, universally distinguishes a vested remainder from one that is contingent.' (*Fearne,* 216, 217; 2 *Bl. Com.* 169; 2 *Cruise's Dig.,* 264, § 8; 273, §§ 40, 41; 4 *Kent,* 202, 206; 1 *Pow. on Devises, by Jarman,* 184, 5; *Lawrence* v. *Bayard,* 7 *Paige,* 75; *Hawley* v. *James,* 16 *Wendell,* 137; *Doe* v. *Provost,* 4 *John.* 61; *Doe* v. *Perrin,* 3 Durnf. & East, 484; *Driver* v. *Frank,* 3 *Maule & Sel.* 37, *Bailey, J.*; *Doe* v. *Prigg,* 8 *Barn. & Cres.* 231; *Right* v. *Creber,* 5 *id.* 866; *Chit. on Des.,* 235, 6; *Cornish on Rem.,* 98 § 1.)"

The phrase " from and after ", which is also included in the instant limitation, was expressly held not to require postponement of the vesting of the estate (p. 19): " The terms made use of by the devisor, in this case, that ' *from and after* ' the decease of the devisee, Mathias, ' I devise the same to the first son of the body of the said Mathias,' were not intended to indicate the time when the remainder should vest in interest, but the period when it would vest in possession and enjoyment. ' Much more effective words,' said DANPIER, J., in pronouncing an opinion on a similar clause, ' have been holden, in some of the cases above cited, not to prevent the vesting of estates.' (*Driver* v. *Frank,* 3 *Maule & Sel.,* 32; *same case in error,* 6 *Price,* 41; 8 *Taunt.,* 468; 3 *Moore,* 519; *Doe* v. *Moore,* 14 *East,* 601; *Bromfield* v. *Crowder,* 1 *New Rel.,* 313; 2 *Cruise's Dig.,* 295, 300; *Doe* v. *Norvell,* 1 *Maule & Sel.,* 327; *Moore* v. *Lyons,* 25 *Wendell* 119, 140.)"

The same result was reached in *Van Rensselaer* v. *Kearney* (11 How. 52 [U. S.] 297), where the testator devised certain

real estate to his grandson during his natural life and from and after his decease to the first son of his grandson and to the heirs male of his body and in default of issue then to the second, third and every other son of the grandson successively and in remainder. John, the first born son of the grandson, was born in 1791 after the death of the testator and died without issue in 1813 prior to the termination of the life estate. It was held that on the birth of John, his (John's) remainder became indefeasibly vested. The court said, per Mr. Justice NELSON, at page 318:

"On the birth of John, the first-born, his remainder as the first tenant in fee tail, which was before contingent, became vested in interest, and he was thereafter seized of an estate tail in remainder, the vesting in possession being dependent upon the termination of the life estate.

"The interest in the estate in remainder in which they vested immediately on his birth carried with it a fixed right of future enjoyment in possession, the instant the life estate terminated."

### English Authorities.

In several early decisions in England, similar results have been reached (*Archer Case,* 1 Co. Re. 66a; 76 Eng. Rep. 146, *supra; Doe* v. *Prigg,* 8 Barn. & Cr. 231; 108 Eng. Rep. 1030 [1828]; *Emperor* v. *Rolfe,* 1 Ves. Sen. 208; 27 Eng. Rep. 986 [1748]; *Wakefield* v. *Maffet,* 10 App. Cas. 422 [1885]).

In *Doe* v. *Prigg* (*supra*) the devise was to the mother of the testator for life, then to his wife for life, and from and after the decease of the mother and wife, to the *surviving* children of two other persons in equal proportions. On the testator's death, there were seven such children living, three of whom however died before the termination of the life estates. It was held that the deceased children took vested remainders, though they predeceased the termination of the life estates.

In determining whether the interest of the children was to vest immediately upon the death of the testator or whether their estate was to be contingent until the termination of the life estates, the court stressed consideration of the question whether the word "surviving" referred to survivorship of the testator or of the mother. Holding that a construction ought to be adopted which would tend to vest the remainder, the court added (8 Barn. & Cr. 231, 240; 108 Eng. Rep. 1030, 1033): "And the testator's death is in this case so much the more rational period, so much the more likely to have been intended, and falling in, as it does, with the rule of law for vesting estates

as soon as they may, instead of leaving them contingent, that we are of opinion that the estate here vested in remainder immediately upon the testator's death, in the then children * * *; and that upon the death of those who died after the testator, and before the testator's widow, their sevenths descended upon their respective heirs at law * * *."

The question has frequently arisen in England in connection with marriage settlements of personalty, where the fund, after a particular life estate to the husband and then to the wife, does not go to any particular son but is left to be appointed to the various children, or is specifically given to the sons on attaining the age of twenty-one, or to the daughters in the event of marriage with consent. It has been uniformly held in these cases that on attaining the age of twenty-one or on marriage with consent, the interest becomes vested so that if the child dies in the lifetime of both or either of its parents, the share of such deceased child goes to his or her estate.

In *Wakefield* v. *Maffet* (10 App. Cas. 422, 435, 436-437) it was stated: "The rule, then, being, that in the construction of a settlement such as that before us there is a presumption or an implication that the settlor providing for his unborn children intended that, according to ordinary practice their portions should become vested at twenty-one or marriage, we have to examine and see whether there is to be found in this settlement any clear language evidencing an intention to depart from this practice and make the right of the child contingent upon his surviving both parents. * * * The case of *Emperor* v. *Rolfe* [1 Ves. Sen. 208] originally established the strong and irrebuttable presumption that in marriage settlements the shares of children are intended to become vested when they are wanted; That is to say in the case of sons at twenty-one and of daughters at twenty-one or marriage; and it would certainly require very strong language indeed to shew that any other construction than this would be consistent with ' the truth and honour ' of the settlement."

Upon this analysis of the English authorities, it was Mr. Gorman's clear opinion that the intent of the marriage settlement here involved was that the property should become vested in the Tenth Duke of Marlborough when he succeeded to the title.

Careful consideration of the foregoing authorities compels the view that the interest of the present Duke vested indefeasibly upon his succession to the Dukedom. Although the gift to the present Duke is contained solely in a direction to convey at a future date, survivorship is held not a condition of the gift since

the postponement of vesting was for the purpose of letting in an intermediate estate. There being no clear indication of a purpose to annex futurity to the substance of the gift, and applying the canon of construction under which the courts have traditionally favored the early vesting of estates, the result is that the present Duke upon his accession to the Dukedom in 1934 acquired an indefeasibly vested remainder.

And this is so, whether the law of England or New York applies. Although the plaintiff trustee, in the complaint, sought an adjudication as to whether the law of England or New York governed construction of the trust, that question need not here be determined, since there is no significant difference in the jurisprudence of the respective jurisdictions upon the subject of the vesting of future estates.

The trustee, accordingly, in arriving at a determination as to the course to be pursued in regard to the liquidation of the English estate duties, is required to account only to the present Duke and Consuelo.

### Conclusion

What has already been said delineates clearly the procedure now to be pursued by plaintiff trustee. The duties claimed to have become payable upon the death of the late Duke should be paid, compromised or otherwise discharged. Any other course would expose the trust to the risk of an inordinately greater liability on the death of Consuelo.

It follows therefore that an interlocutory judgment should be entered herein directing Harold S. Vanderbilt, as surviving trustee, to take such steps as are necessary in his discretion to compromise, pay or otherwise dispose of the claim of the English tax authorities for estate and succession duties claimed to be due by reason of the death of the Ninth Duke. Said judgment should also adjudicate that Consuelo is the settlor of the trust with power to assign her interest therein; that the remainder in the said trust fund vested absolutely in the Tenth Duke of Marlborough upon his accession to the Dukedom, and that the plaintiff trustee be directed to serve and file an accounting of the proceeding of the trustees acting from time to time of each of the trusts created by the marriage settlement.

Proposed findings of fact and conclusions of law have been passed upon and signed. Submit interlocutory judgment in accordance with the foregoing within ten days upon five days' notice.